and Nafis Kuei. At this time, would counsel for the Appellant Kuei please introduce herself on the record to begin. May it please the Court, Zanabrua Mala on behalf of the Appellant Mr. Nafis Kuei. I would like to reserve two minutes for rebuttal. Okay, you may. Please in chief, Mr. Kuei moved for a judgment of acquittal. The Court reserved ruling but ultimately a judgment of conviction was entered for a money laundering conspiracy. Now the evidence in this case is not sufficient where the government has failed to establish that Kuei knew the money he was receiving were criminal proceeds. The District Court also erred in its jury instructions. So I want to first start with the evident jury gaps we have in this case. Mainly that the government did not present evidence that Kuei had any knowledge of a communication between Kuei and Shermer, the romance scam victim. There is no communication between Kuei and any alleged co-conspirator about a romance scam. We don't even have evidence in Kuei's phones or in his emails of romance scripts targeting other women. And even when Kuei is questioned by one of the banks about the transaction on his account, the bank doesn't tell Kuei that the transactions look suspicious. And when co-defendant Sepetu is approached by law enforcement and questioned, and she tells Kuei about that interrogation, there is no evidence that she tells him that law enforcement suspected. Well, there's no direct evidence, but can't from the circumstantial evidence the jury infer that, in fact, he did have that knowledge? The jury can if those inferences are reasonable. Of course, if circumstantial evidence gives equal or nearly equal support to a theory of guilt and a theory of innocence, the evidence is not sufficient. And here we're looking at the question of what was Kuei's knowledge as to these deposits? Did he know that there was a criminal reason why Shermer was depositing funds into his account? We have multiple deposits from Shermer into the account, but again, we don't have those communications between Shermer and Kuei. And it's equally plausible that Kuei believed that Shermer was a third-party agent used by ANSA to facilitate the transfer of money. If you look at the evidence in this case, the bank records introduced by the government, there's multiple outgoing wires to commercial companies that sell industrial equipment. There's evidence in this case, testimonial evidence, that Kuei was operating an exporting business, and the financial records in this case support that. There's wires to these printing companies. There's defense exhibits that include receipts where Kuei spent thousands of dollars on printing equipment. There's cashier's checks made out to car auctions and salvage businesses. Again, Kuei was in the export business. There is this economy where individuals in Ghana are seeking individuals in the United States to purchase items and ship them over there, and he had been doing this for years. You suggested that Kuei might not have, you know, been kind of tipped off to the suspicious nature of this because an agent might be making these purchases, but didn't Kuei also testify that normally the person first meets the agent and doesn't just have kind of this mystery person? Well, it's not a mystery person in this case because ANSA was introduced to Kuei by Nana, and in this community, when you have a respected person in the community, which was Nana, that introduces another individual in the business to you, that carries weight. Nana vouched for ANSA, so it was reasonable for Kuei to rely on that and to believe that this was just another person that was a third-party intermediary that facilitated the money coming into his accounts. And again, it's like there's money coming in, like, over a course of several years, but he's also purchasing- Was there any evidence that there were any other third-party agents that Kuei used? He said in his history that he typically used, or the individuals in Ghana typically use third-party agents, but in this particular record, I don't think we have, like, the name of another third-party agent. But we do have the bank records and the financial transactions that show he had been purchasing these items, cars, industrial equipment, for years, and his- what was par for the course for him was individuals advancing him the money, he uses that money to source the equipment, and then he facilitates the shipping, and the difference between the price he paid for the equipment and the money that was sent to him is his profit. But there was essentially no documentation. There wasn't really business records, per se, here that Kuei had for his business, was there? Well, he did have invoices, or a couple of invoices. Yeah, a couple of invoices. That doesn't get one very far, does it, as far as determining the validity of a purported business? I think, but we have the bank records, and this is evidence that the government introduced. We see that there's outgoing wires to these companies that sell industrial equipment. We see that there's receipts from the defense exhibits that show Kuei was purchasing equipment that was, like, thousands of dollars. One transaction alone, or one piece of equipment alone, was worth 230,000 euros. So we're talking about large amounts, and it's not just the fact that there aren't that many invoices, but the bank records support that this was a legitimate exporting business. I also want to point out the fact that— Let me also ask you, Judge Dunlap mentioned that, in fact, and I look at my notes, your client did testify, as did the other client. So when they testify, also, the jury is weighing their credibility, is weighing the evidence, and I'm sure—I don't have the whole transcript here before me, but I'm sure they got posed tons of questions about all these transactions. So doesn't—isn't that another factor that, again, goes to my earlier question, weight of the evidence, credibility? It's the jury province. Certainly that we make credibility determinations in favor of the verdict. That doesn't mean you totally disregard the defense evidence. There's also portions of Quay's testimony that the government does not dispute. Again, the bank records support that he was exporting these items to Ghana, and then— For that, we would have to look at the evidence in the light most favorable to Quay, and that's not our test. It's in the light most favorable to the jury verdict. Right, but if the evidence is not disputed, you could look at the evidence that's in the light most favorable to the government and to the jury verdict, but the inferences cannot be reasonable. The jury can't base their conclusion on speculation or guessing. So for example, even if the jury did not believe the entirety of Quay's testimony, that's not a substitute for affirmative evidence that Quay knew that Shermer's wires were a result of criminal activity. And I want to point back to, like, there's no communications between Quay and Shermer about this romance scam. There's no communications between Quay and any other individual about a romance scam. This is just— You had a bunch of things, because you had this common origin of the funds. Then you have this debate over whether it's an agent or not, but that's a jury question. Then you have, you know, the lack of documentation. Then you have the spending habits of both Quay and Sepatu, where the large incoming wire would come, and then they'd immediately spend the money. And then there were the large, you know, personal purchases that were being made. All of that together, you don't need something expressed, do you? The jury can take a look at all of that and make its determination. Sure, absolutely, as long as those inferences are reasonable. But here, based on the evidence that the government presented, they're asking the jury to begin to stack inferences. Again, even if the jury didn't believe the entirety of Quay's testimony, it's not a substitute for evidence that Quay knew the wires from Shermer were a result of criminal activity. There's these big missing pieces of evidence between Quay and any other individual about a romance scam or any criminal activity. I also want to point out that, again, when the bank questioned Quay, they didn't say, oh, we suspect some type of criminal activity. So if I may finish up, this case is very different from other cases where there's information flowing to the defendant that some third party thinks some criminal activity or money laundering is going on. Flores is a great example of that, where the defendant was told that there were suspicions of money laundering, and we don't have that here. So assuming that we disagree with your argument on the willful blindness and the good faith, I mean, if we think that the jury instruction was adequate, how do you—why isn't this a case of willful blindness? If we think the jury instruction for good faith was adequate? Yes, and willful blindness. So for the same reasons that there's an issue with the sufficiency in this case, the willful blindness instruction is warranted if there's facts suggesting a conscious course of deliberate ignorance. And again, the government hasn't presented that case here. There hasn't been any notification to Quay from the bank or law enforcement that they suspect illegal activity. Quay was cooperative with law enforcement when Sepatu told him that law enforcement approached her. He gave the documents he could provide because he didn't have all of the documents. When they asked for further documents, he said, that's all we have. And law enforcement didn't reach out to him again until after all of the—didn't reach out to him until after the transactions had been completed. So we don't have those red flags or those triggers that would warrant Quay to investigate. And thus, there is an evidence that there's a deliberate course of ignorance. Thank you. Thank you, Counsel. At this time, would Counsel for Appellant Sepatu please introduce herself on the record to begin? Good morning, Your Honors. May it please the Court, I'm Quinn Judge for Suna Sepatu, and I'd like to reserve two minutes as well, please. You may. It's important in this case to look at my client as an individual and not lumped together with Mr. Quay. And when you do that, there are three things that come through about the government's case, which is her total lack of knowledge about Mr. Quay's business and how it operates. She consistently sort of says, oh, I don't know. I have to ask. I don't know. This is something that the government—the second thing is something that the government overlooks but is in their case in chief. And when we're talking about sufficiency, we're looking at the evidence that came in before the government closed. In their case in chief, you do have evidence that my client is asking questions. I have a question about how we file taxes. Can we talk about that? That's before she ever talks to any agent. And again, before she talks to any agent, what are the overall profits of the business? I never know when they ask me that, referring to the questions she gets from the bank. And then the third thing that comes through, again, in the government's case in chief is that she is creating records for her part of the role, for her role. She is screenshotting the wire transfers. She is holding onto those deposit slips. Remember that this case starts at a border stop because she has some deposit slips in the car that the agents find. So she is not not keeping records or asking questions. She is, in fact, keeping records and asking questions. And so when you look at her as an individual, you also have to keep in mind all the evidence that there isn't. Obviously, there's no evidence directly connecting the defendants to the romance scam, as has been alluded to. But my client also has no connection with Mr. Ansah or his family. She is not—neither she nor one of her businesses are a recipient of an email connected with Sean Walker, the name of the romance scammer's fake name, his identity. But my question is similar to what I posed, counsel, for the co-defendant. Again, we look to circumstantial evidence, as Judge Thompson also noted. There's instructions. There's a willful blindness. The jury weighs the evidence. Your client testified also. So how do you get around that? So I think with respect to my client's testimony, I think I would agree with the government that for the sufficiency case, we're looking at the evidence as it went in before the government case rested, because the court at that point reserved judgment. So that's the state of the evidence. And so I don't think that comes in— Okay. So forget her testimony then, but everything else, particularly with the willful blindness instruction? Yeah. So everything else. When you look at—first of all, I don't think the government has identified any willful blindness case where an individual defendant was engaged in inquiry. All the willful blindness cases are either people sort of closing their eyes and saying, I don't want to hear that, I don't want to see that, or cases where there is testimony that they heard a phone call about drugs or they were acting in manners that were deliberately furtive with a suitcase stuffed with—I forget whether it was money or drugs. But they are acting deliberately. We don't have that here. So I do—I mean, I can go through the government's sort of buckets of what we can look at as they pertain to my client. First, the government says the funds have this investment label in it when you look at the bank statements. This seems like a quintessential should-have-known argument. She should have known something was up because in these three lines of code in the bank statements, it says investment. Agent Dunn testified before the government arrested that, yes, a buyer in Africa could transfer funds to a U.S. account and use that. I don't see why that can't happen, he said. Should have known that something was up because of this investment label in the bank fields. That's an awful lot to draw an inference that she knew that there was money laundering and that she knew that the transactions were designed to conceal money laundering. So I don't think you get there on that. The government argues that Quay's business lacked indicia of legitimacy. Well, what was on Quay's cell phone doesn't go to my client. The fact that his cell phone didn't have contacts with people, the fact that his business, including the businesses that had been conducted from 2014 up until 2018, which is when the deposits first came into the account associated with my client. What happened with his business before that and the lack of records for that? She never claimed to be his accountant or bookkeeper. You can't ascribe... Except Sepatu was setting up this business kind of shell for Quay. So there's a direct connection there. So you can't entirely divorce what Quay was doing because Quay was using Sepatu to kind of further his business schemes. Right, you can't. But you cannot then draw a broader inference. The government, for example, cites the Corchado Peralta case. In that case, the court says, okay, the wife was the bookkeeper she knew about the funds coming in and out, and she asked the husband whether these funds were legitimate. That's enough to infer that she had knowledge of the actual money laundering. But then when she goes on and makes the transactions and spends the money, the court specifically says that you can't have a jury convict on evidence that a wife who spends a husband's money knowing that the money is in some way tainted is engaged in criminal activity, is a money laundering conspiracy, and says what she mostly did is make large deposits into an account given to her by her husband, and quote, there was no inference of concealment or disguise. So she's certainly involved in the Logitech business in that she opens the account and she opens the business. She worries about keeping the paperwork current with New Hampshire because when she talks to Agent Dunn and he says, oh, your paperwork has lapsed, she goes that way that day and fixes that. So the lack of records, the questioning that he received about his businesses before she was ever said to have any involvement in that doesn't put her on any kind of notice, doesn't give her any kind of knowledge. And with respect to, I think I just addressed it with the Curchato Peralta case, her personal spending, again, the government is lumping Quay and Sepatu together here. What she knows is she has a boyfriend who's a businessman, and he's got more money than she does, and he's spending money on her and he's letting her spend some of his money. That's not criminal, and you see that in the Curchato Peralta case, that that's not criminal. The government talks about minor inconsistencies. Well, again, with respect to my client, I think it's a real stretch because the only inconsistencies that they're relying on from their case-in-chief are that over the course of her conversation in Dunn, she offered up more details about the business. And that's a conversation. You start with the sort of general topic, what does your business do, and then you provide more details. That's not inconsistency. And so, again, if you look at the Perez Melendez case, you have some individuals who are inconsistent on, the court says, three different things for one of the defendants. They contradict each other, they contradict a third party. And in Perez Melendez, that wasn't enough to show knowledge. That was a sufficiency case, and again, the court said that wasn't enough to show knowledge. So with respect to my client, I would say that each of the things that the government relies on just don't get you the inference that the government is looking to draw. And just briefly about the conversation with Agent Dunn, I think the government's summary of that is perhaps, I think it's worth going back and looking at the exact testimony there on Joint Appendix page 144. Because the question he's asked is, did you at some point express any concerns? And he says, I did. He says, I would feel more comfortable if she could provide documentation. He's not, he's just saying, I would feel more comfortable if you could provide documentation. He's not making an accusation against her. He's just asking questions. And the government says, well, she had that conversation with Agent Dunn, and then they kept doing business. Well, that's the same thing you would do if you had a legitimate business. You would keep doing business. So you can't draw the inference. The inferences that the government wants to draw are just taking it a step too far, especially when you look at my client and her limited role and her limited knowledge and connections to the other individuals involved. Thank you, Counsel. Let's hear from the government then. Please do introduce yourself on the record to begin. May it please the Court, Anna Krasinski on behalf of the United States. Sufficient evidence supports the defendant's convictions for money laundering conspiracy in this case, and the Court properly instructed the jury. This Court should affirm both defendant's convictions and defendant's sepulchre sentence. I'd like to start by talking about the sufficiency of the evidence, which, again, rests on the evidence presented in the government's case in chief. And I think that's important because all of this evidence of defendant Quay talking about it being a third-party agent, that comes from his testimony. And so we're not considering that when we're talking about sufficiency of the evidence here. So what we have for Quay is a pattern of repeatedly opening businesses using a trusted family member or friend to open it in their name, to open a bank account in their name, that he ultimately controlled, where $3 million of this victim's funds passed through those various accounts and were ultimately, a majority of those funds transferred to other entities in Ghana. That's coupled with... So, I mean, so are you saying that there was an inquiry duty? So, I think the evidence here supports an inference of actual knowledge, I think at a minimum. But there's no direct evidence that Quay knew anything about Schwarmer, I don't know how you pronounce her name, or the romance relationship, romance scam relationship. That's right, Your Honor. I think like in most cases, evidence of knowledge and intent is circumstantial. I'd agree that that's the case here. But I think the circumstantial evidence here is sufficient to support an inference of actual knowledge, and at a minimum willful blinds. So it's actual knowledge of laundering. So you're talking about actual knowledge of the  Actual knowledge that the funds themselves were from, were illegal proceeds. I don't know that there's, I think for Quay, there's one... Circumstantial knowledge that the proceeds were from illegal funds. Correct, Your Honor. So what was the... And for Quay, that includes an email in the record from this fictitious scammer that was forwarded to Defendant Quay, and it was an email using that Sean Walker name, confirming funds transferred from the victim to one of Quay's accounts. It includes evidence that Quay had a relationship with the scammer. It included evidence that they had this type of friendly relationship, and then if... So we have one email over a period of years, and we have a personal relationship? With the scammer, yes. And when that is coupled with years of creating shell businesses and funneling over $3 million of the same victim's funds that clearly show on the bank records... The government's evidence shows some legitimate business transaction. Is that correct? I think there's legitimate business action from 2013. The emails that are related to legitimate business activity, they're from that first business where the defendant and a childhood friend also had a storefront. When we're talking about Logitech, the business that both defendants were involved in, the only evidence of purported business activity are these three invoices that don't mention their business at all. And so, yes, there's some historic evidence of business activity, but it's not nearly enough to account for over $3 million of the same victim's funds going through Quay's various accounts, and over $800,000 going through the account that Defendant Sepatu set up at the direction of Quay. And so those also have to be coupled with the other evidence in the government's case in chief, and that includes... So is it based upon the amount it's necessarily an inference that these are illicit funds? I don't think by itself quantity would support that inference, but in this case, when you look at what he said the account was for and what Sepatu said... I'm sorry. I'll be a little bit more specific. When you look at what Quay said the account was for and you look at how it was actually used, what he said to law enforcement, what he said to the bank account representative, what he said to... Yeah, what he said to the bank representative and what he said to law enforcement, they don't correlate. He said, first of all, that the victim was someone who was a car CEO. But then when he was talking to law enforcement, he said, I think I bought computer parts for her, and no, she never sent money to any other account other than the Logitech account. And that's inconsistent with the bank records over a course of years. And then there's all of the personal spending from all of these various accounts, the cash withdrawals, from which a jury could reasonably infer that he knew these funds were not legitimate business funds. There are these ties to the scammer, and then there are the real lack of business records that go through all of these separate shell companies that he repeatedly opens in somebody else's name. And I think from all of that together, that was ample evidence from which the jury could reasonably infer knowledge. Counsel, would this be similar? I know the court has had cases in the past where somebody's charged with conspiracy to distribute, for example, cocaine, and somebody's been thinking he's distributing heroin or something else and doing all these drug transactions, not cocaine. But that would be similar to what you're saying. They're doing this type of conduct, and it would definitely fit in that. I think they knew, that's right, that they were taking in illegal money and funneling it out. That's what I'm saying. They're doing something illegal. If they don't know, out of, let's say, ten facts, one of them knows seven, the other knows six, but still they know it's illegal and they continue to do it, that would allow the prosecution to go forward, would it? Yes, Your Honor. And I believe there's ample case law, you know, in analogous scenarios, not exactly on this same type of scenario. Yes, Your Honor. I think the government has to show that they knew it was illegal proceeds, but not that they knew it was Sean Walker pretending to be someone in a romance scam. And I think the evidence here shows what the government needed to prove, which was that it was illegal proceeds. And for... So, illegal proceeds, but not precisely the source of the illegal proceeds. Correct, Your Honor. But is it necessarily illegal proceeds because they're keeping bad records and spending it on personal items? I think if you... I'm trying to figure out what makes it necessarily illegal, as opposed to maybe there's some generous benefactor out there who's giving away money. Well, two points to that, Your Honor. The first is, in the sufficiency world, we're looking at this in the evidence in the light most favorable to the verdict. And so, we're not looking at the inference that this is some benefactor who's decided to give Defendant Quay $3 million over the course of, you know, a number of years. And so, we're looking at this in the light most favorable to the government. And I think in isolation, personal spending is not enough. But that's not the case here. It's this personal spending and... It's personal spending and the vast discrepancy between what each defendant said about how the account was used and what the records show how the account was used. It's the lack of indicia of legitimate business conducted by the specific business that these two defendants engaged in. And so, it's all of this combined. I don't think that when we're reviewing sufficiency, we look at each piece of evidence in a vacuum. It's looking at the reasonable inferences the jury could draw from the evidence as a whole. And I think when you put it all together, it's more than sufficient for the jury to infer knowledge in this case. So, on the issue of business transactions, are you saying that there were no legitimate business transactions after 2013 according to the government's evidence? Quay testified that there were business transactions. There are no records of legitimate business transactions that mention Logitech, their business. So... But, once again, as you pointed out, we're not looking at their testimony. We're looking for that at the end of the, when the government rested. So, I'm just trying to figure out when the government rested, what evidence of illegitimacy did government present? So there were, the only records in the government's case in chief that related to their joint business, were three invoices that did not mention their business at all. And so, when we're talking about the Logitech business in the government's case in chief, there was no evidence of legitimate business activity. What the agent testified was that there were some old things on the defendant's phone. And in cross, his attorney showed the agent some emails, which were 2013-ish, so not contemporaneous with the Logitech business. And the agent testified, yes, those were on the phone. Most of those were from 2013. But there were no communications on Quay's cell phone that related to shipping goods internationally. What the agent testified was that there were limited communications about percentages. And a jury could reasonably infer from that, that the percentages they're talking about are his cut of the victim's money. So, in the government's case in chief, there was no evidence that Logitech... So, is there evidence in the opposite direction? I mean, so all of this money is getting shipped into these accounts. We know that there was evidence that some of it went towards personal spending. Is there evidence about where the rest of it went? So, what the bank records show, and the text messages between the defendants show, is that a lot of it was wired directly, three or four days after the money came in, it was wired directly to companies in Ghana. And what one main company, the evidence showed, was a company related to the scammer. The scammer that Quay had a personal relationship with. And so, that's what the bank records and the evidence in the government's case in chief showed regarding the bulk of that money. And so, I think the reasonable inference from that is they're doing their job as a pass-through. They're accepting these illegal proceeds, they're taking their cut, and they're passing the rest on to the scammers. And so, the reasonable inference from the government's perspective is that the money being received in Ghana is not for a legitimate business purpose? Yes, Your Honor. I think that's right. I mean, did the government look into that? Yes. And the agent testified in the government's case that he looked up some of the companies that they were sending money to, that some of them he could not find any presence of at all. And some of them he attempted to subpoena records for, but because they weren't American companies, he was unable to get records. He also testified about one large purchase for this machine called a crusher, which the defendants claimed was something they purchased for this business. The business that received the crusher, the agent testified, never interacted with these defendants, had no records of these defendants, never communicated with these defendants at all. And so, the evidence in the government's case in chief did show that the agent tried to look at whether or not these, to determine whether these were legitimate business expenses, and he couldn't find anything to support the idea that they were. What about Sepatu, specifically, in her knowledge? Yes. So, for that, I really look at the big discrepancy between what she said about the account and how the account was used. Again, in the government's case in chief, the testimony was that she said this was a business that she ran out of her home that made very little profit, and all the money came from Africa. In fact, this is repeated multiple times in the government's case in chief when the agent is testifying about his interactions with her. The money came from Africa. The money came from Africa. The money came from Africa. The bank records show a very different story. There was more than $800,000 wired into this account from a single U.S.-based source. The bank records show the victim's name. They show that the funds were from a U.S.-based source. They show that the funds were earmarked for investment. And so, there's a vast discrepancy between what she said the account was for and how the account was used. And that huge mismatch is something from which the jury can infer knowledge. And that, again, is coupled with the use of the funds, you know, the shopping. When you say there's a mismatch, the mismatch is where? Well, one would not expect someone who says they have a business that makes very little profit to receive over $800,000 in the span of months. The government's case in chief also showed that the agent asked her who the victim was, as her name is on all of these transfers, and Sepatu said, I don't know who she is. I don't know if she's a U.S. citizen. I don't know if she's a customer. And so, for someone who claims to be running this business out of her house, that makes very little profit, to have over $800,000 coming in from, which provided the vast majority of the money coming into the account, and to have her say she has no idea who is putting the money into this small business that makes very little profit. Is there any evidence that Sepatu engaged in any legitimate business transactions through the Logitech company? No, no, Your Honor. There's no evidence of that at all. Her story was she didn't have anything to do with this. She was just doing all of this for her boyfriend. Her story when she testified, yes. And I think that's something the court can consider when deciding whether or not the court properly instructed on willful blindness. The problem with that, Your Honor, is what she told the jury was very different than what she told law enforcement. What she told the jury was, I just did whatever Quay told me to do. What she told law enforcement is, this is my business. I have 10 employees. And the jury heard all of these different statements. And so it's not just the fact that she said that to the jury. It's the fact that, one, the jury could assess her credibility, but two, they heard that in the context of knowing that she had said something completely different to law enforcement. And that what she said to law enforcement was different than what the bank records actually showed. And so, sure, that is what she told the jury. But the jury was free to reject it. And the reasonable inferences that they drew from the government's case in chief and the reasonable inferences that the court drew from the case as a whole supported both the willful blindness instruction and the government's case in chief evidence supported an inference of actual knowledge. I might be misremembering the record, but was her statement about the 10 employees relative to her own... I mean, she had a business. She did have a legitimate business, correct? Correct. She had a legitimate job. It was not a business. She was an employee for another business. But when she was talking about her business, she was talking about Logitech, this business she set up, as she testified at Quay's direction. She certainly had separate employment. But when she's talking about her business, it's this business. Okay. Anything else, counsel? Thank you. Thank you. I ask the court to affirm. Okay. Let's hear rebuttal, two minutes each counsel. At this time, would the attorney for Appellant Quay please introduce herself back on the record? She has a two-minute rebuttal.  Sandra Ruhemahl on behalf of Mr. Nafis Quay. I want to first start with the government's assertion that this court is cabin to just the evidence presented during the government's case in chief. The government filed a 28-J letter that refers to the case of Royce, but Royce does not state that we can't consider a second motion for judgment of acquittal. In this case, there was a motion for judgment of acquittal made at the end of the government's case in chief, and there was a second one made at the end of the defense's case in chief. What Royce and what Rule 29B tells us is that that first motion is still preserved. And the defendant, even if they put on a case, they could focus on a challenge to the court's failure to grant that first motion. It doesn't mean that the court can't consider the second case, and it doesn't mean that the court can't consider the evidence that the defendant put on in this case. So the court is not limited to solely the evidence put on during the government's case in chief, which opens up the court to considering Quay's testimony and the testimony from the other witnesses in the defense case. I also want to address the Walker email. The government states that Quay had this relationship with the scammer, but again, where's the evidence that shows Quay even knows about the scam? From Quay's perspective, it's just another business relationship. Is it one of the hardest things about these kinds of cases is that the best scammers don't have any paperwork? So the one thing that I'm struggling with here is what you're essentially saying is that the best scammers should go free because there's no record. That's the real, you have to build inferences. That's what these cases are about. And so if somebody did a really good job and kept their papers clean, that can't be enough. You can't just set aside the kind of the circumstantial inferential stack that the government would have to prove in that kind of case. That is correct. And we're not alleging that there must be some direct evidence of this scam, but we're alleging that the inferences must be reasonable. I think a good example is the government referring to the inconsistent statements at the airport. The inference in our favor would be that Quay was nervous and he was mistaken. The agents were asking him to recall details of transactions going back several years, and because he was just overwhelmed, he probably just made some mistakes in giving his statement. An inference in favor of the government might mean that we don't get that inference, but that he was being untruthful just because he was just making mistakes and he was overwhelmed. Maybe the government's inference is that Quay was just being untruthful, but then they don't also get the additional inference that he was being evasive because he knew it was coming from an illegal source. There must be some evidence. Again, the inferences must be reasonable. And I also just want to address the bank records. The government alleged that they focused a hyper-focus on 2013 and a hyper-focus on the fact that there aren't more invoices, but we can't ignore the bank records that the government introduced, and those bank records extend into 2017 and 2018 and 2019, and they show that there are multiple wires after 2013 and after 2015 going to businesses not just in Ghana, but businesses that sell industrial equipment in Europe. There's a $20,000 outgoing wire in 2015. There's a $20,000 outgoing wire in 2017. So there is this financial history of legitimate exporting business going on, and we're not limited to just looking at the invoices that were presented by Sepatu. So the fact that there were legitimate invoices and then complete absences of invoices, what are we supposed to do with that? I mean, what inferences to be drawn from that? I mean, do we just say, okay, he's a bad record keeper, or he was put on notice that something was up and that he had a duty to inquire? Poor record keeping is not a crime, and there's no duty to inquire unless there's these red flags that show that there's some illegal activity or something suspicious. And again... And you're saying that this one email, it was just one, right? It was just one with the woman's name on it, and you're saying this one is not sufficient because it didn't specifically have any kind of flag that she wasn't a legitimate business person? Right. If you look at the content, and you're referring to the Walker email. Yes. If you look at the content of the email, it's just confirmation of a wire transfer, and Quaye believed that she was just a third-party intermediary for the financial transfer. And there's no evidence that Quaye even knew who Sean Walker was. You only have that single email. It's an unsolicited email. The email is not responded to by Quaye. So the email doesn't give the government added weight to show that he knew that there was money from Shermer and the money was coming because of some illegal activity. Okay. Thank you, Counsel. At this time, would Counsel for Appellant Sepatu please introduce herself on the record to begin? Thank you. Emma Quinn Judge for Suna Sepatu. I want to start with what the government calls a big discrepancy in my client's testimony, and that discrepancy requires relying on the government's summary of my client's testimony that she ran the business. The agent's testimony wasn't that she said she ran the business. The agent's testimony was that she said it was her business, which it was. She had registered in New Hampshire, and she worked from home. That was what her testimony was. There's not a big discrepancy between that and what she then went on to say about not knowing profits, not knowing the finer details of the business. Well, is it not knowing the finer details, or did she not know what was going on with large transactions and no apparent explanation for those transactions? She did say she didn't know who Marianne Schirmer was. She sort of described in general terms that the business exports things to Ghana, computers, IT, and then there was a question about a crusher, and then she said, oh, yes, also that crusher. That's part of what I'm getting at. I mean, it's explanations about computers. It's explanations about cars. It's explanations about crushers. I mean, nobody seems to know what this business was about, which seems to me to be a relevant consideration for the jury. Right, but again, looking just at her and her knowledge, the government put on evidence from two other people who talked about how Mr. Kwe was known. He was known as an IT guy who also exported stuff to Ghana. He was a businessman, and so I don't know that she is accountable for knowing all those details of the business. There's no suggestion that she had the type of role in the business where she was accountable for that. She said to the government agent, I'm learning as I go, and her pre, you know, before she ever talked to any government agent, her own activity shows that she is asking questions as she goes. She is making inquiry. So what she told the government agent is consistent with the evidence the government put on. But it's inquiry to be able to explain to other people what's going on more than for her to really understand the business. In other words, it's to further, you could read that as furthering the cover as opposed to really understanding what the business is and what the business is doing. To read that as sort of furthering a cover, though, you have to assume that she knew enough to know that she needed to cover up, and that's, you know, that's where we get into a circularity problem. I mean, the government wants us to draw these inferences from different things, but they're also just bad record keeping and not knowing. What about the employees? That is testimony that comes up on cross-examination. So for the purposes of the first sufficiency motion, which I think is what we've been focused on today, that would not come in. I mean, I think what she testified on cross-examination as I was going into this federal building in, I don't remember, New Hampshire or Maine, I was scared, I was nervous, I was just saying whatever came out of my mouth. But that's not part of the government's case in chief. It does not come in before the government rests. All right, just to clear this, your sufficiency argument only goes towards the government's case in chief? You're not making a sufficiency argument at the end of the close of evidence period? Well, there are two motions, and I allude to both of those in my briefing. I think for the purposes of this morning, I have been focused on the first motion. All right, my question is about the evidence in total. What do you say about the 13 employees? What she said about that was I was just scared and nervous. And I don't know that you can draw an inference from that that someone has knowledge of money laundering and has knowledge that transactions are designed to cover up money laundering, which is the knowledge that she needs to have. But you can draw the inference that she doesn't have 13 employees, and she knew that. That's correct. But I don't think that gets you all the way to understanding what's happening when the funds come in and out, because the funds come in, and then they go back out again, which is consistent with buying and selling. Counsel, out of your two Rule 29 motions, one at the end of the government's case and then one at the end of the case itself, after your client's testimony, the stronger one would be the first one, correct? That's... For the second one, it's credibility and her testimony, and there's other factors involved. You know, much as I would love to pick and choose, I think at the end of the day the stronger one is the first one. Okay. Thank you. Okay. Appreciate it. Thank you. Thank you, Counsel. That concludes the argument in this case.